IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:                                          :    CHAPTER 7

    FOREVER GREEN ATHLETIC FIELDS, INC.,    :

                DEBTOR.    :    BANKRUPTCY NO. 12-13888-MDC

---

# MEMORANDUM

BY:  MAGDELINE D. COLEMAN, UNITED STATES BANKRUPTCY JUDGE

On April 20, 2012 (the "Petition Date"), Charles C. Dawson ("Mr. Dawson"), Kelli L. Dawson ("Mrs. Dawson," collectively with Mr. Dawson, the "Dawsons"), and the law firm of Cohen, Seglias, Pallas, Greenhall & Furman, PC ("Cohen Seglias," collectively with the Dawsons, the "Petitioning Creditors") filed an involuntary petition under chapter 11 of the Bankruptcy Code, 11 U.S.C. §101 *et seq.* (the "Involuntary Petition"), against Forever Green Athletic Fields, Inc. (the "Putative Debtor" or "Forever Green").  Thereafter, Forever Green filed the Motion to Dismiss the Involuntary Petition dated October 26, 2012 (the "Motion to Dismiss").[1]  In the Motion to Dismiss, Forever Green seeks dismissal of the Involuntary Petition on the grounds that it is a bad-faith filing and an abuse of the bankruptcy system initiated by the Petitioning Creditors to frustrate the prosecution of the Forever Green's claims against Mr. Dawson, ProGreen Surfaces, Inc., Daniel A. DaLuise, Donna L. DaLuise, Raymond Fritz, and ProGreen Sports Surfaces, LLC (collectively, the "ProGreen Parties").

All parties concede that each of the Petitioning Creditors holds bona fide claims against Forever

---

[1] This was the second motion to dismiss filed by Forever Green.  As memorialized by this Court's Order dated September 7, 2012, the Forever Green's original motion was granted because the Petitioning Creditors failed to deliver a copy of the original summons to a specific person authorized to accept service on behalf of Forever Green as required by F.R.B.P. 7004.

Green and that a sufficient numbers of creditors have filed the Involuntary Petition.[2]  However, Forever

Green has alleged that the Petitioning Creditors, and specifically, Mr. Dawson, filed the Involuntary

Petition as a litigation tactic designed to frustrate Forever Green's ability to litigate pending state court

proceedings and to force Forever Green to settle its claims.  After due deliberation and for sufficient

cause, this Court has determined that Mr. Dawson was not motivated by a proper bankruptcy purpose.

The record before this Court demonstrates that Mr. Dawson effectuated the filing of the Involuntary

Petition in furtherance of his pre-existing scheme to frustrate the prosecution of a pending arbitration

proceeding as well as to force Forever Green to pay Mr. Dawson's claim ahead of Forever Green's other

creditors.

Consistent with Fed. R. Bankr. P. 7052, the following discussion constitutes this Court's findings

of fact and conclusions of law.  This Court has jurisdiction over this core proceeding pursuant to 28

U.S.C. §§157 and 1334.

**PROCEDURAL HISTORY**

The Petitioning Creditors filed the Involuntary Petition on April 20, 2012.  On April 23, 2012, the

Petitioning Creditors filed an amended involuntary petition dated April 23, 2012 [Docket No. 3] (the

"Involuntary Petition").  The Order of Relief dated June 1, 2012 [Docket No. 7] (the "Order of Relief")

providing for relief under chapter 7 of the Bankruptcy Code was entered by judgment of default.

Thereafter, Forever Green filed a Motion to Vacate the Order of Relief dated June 21, 2012 [Docket No.

10].  Forever Green argued that this Court lacked jurisdiction to enter the Order of Relief because the

Petitioning Creditors had never caused service of the summons and complaint.

The proof of service submitted by the Petitioning Creditors indicates that service was executed

upon Forever Green on April 23, 2012, by service of a copy of the Involuntary Summons [Docket No. 2]

---

[2] Forever Green did not raise the issue and therefore this Court will not address it.  However, this Court retains some doubt as to whether the Dawsons should be counted as separate creditors for purposes of §303(b)(1).  *Compare In re Mid–America Indus., Inc.*, 236 B.R. 640 (Bankr. N.D. Ill. 1999) (concluding that funds were separate entities holding separate claims even though the claims had been reduced to single judgments) *with In re McMeekin*, 16 B.R. 805 (Bankr. D. Mass. 1982) (dismissing petition after determining that husband and wife creditors only had one collective right to payment and therefore could not be counted as two separate creditors).

(the "Involuntary Summons") via regular, first-class United States mail, postage pre-paid, addressed to: "Forever Green Athletic Fields, Inc., 1961 Hartel Street, Levittown, Pennsylvania 19057."  The proof of service submitted by the Petitioning Creditors did not identify the individual that received on April 23, 2012, the Involuntary Summons and Involuntary Petition.  The Petitioning Creditors provided no indication on the proof of service as to the identity of officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process served.  Based on this omission, this Court determined that it was unable to determine whether the individual who in fact received the Petitioning Creditors' Involuntary Summons and Involuntary Petition was among the class of persons authorized by Fed. R. Civ. P. 4(h) to receive process on behalf of Forever Green.  This Court held that personal jurisdiction over Forever Green had not been established and any judgment or order the Court might enter would be void and would therefore not bind Forever Green.  *In re Blutrich Herman & Miller*, 227 B.R. 53, 58 (Bankr. S.D.N.Y. 1998) (holding that petitioning creditor's "failure to serve the summons and involuntary petition rendered improper, for want of personal jurisdiction, entry of the order for relief as well as the ensuing bankruptcy administration.").  Pursuant to Fed. R. Civ. P. 60(b)(4) as made applicable by Fed. R. Bankr. P. 9024, this Court issued an Order dated September 7, 2012 [Docket No. 20] (the "Order") vacating the Order of Relief and ordered the Petitioning Creditors to effectuate service of the Involuntary Petition in accordance with the procedures set forth in Fed. R. Bankr. P. 1010.

On October 9, 2012, the Petitioning Creditors filed a Certificate of Service [Docket No. 22] in which the Petitioning Creditors certified that a copy of the Involuntary Petition was mailed to "Keith Day, President, Forever Green Athletic Fields, Inc., 124 South Maple St., Suite 100, Ambler, Pennsylvania 19002."  Thereafter, on October 26, 2012, Forever Green filed the instant Motion to Dismiss asserting that the Involuntary Petition should be dismissed for two reasons.  First, Forever Green argued that the Petitioning Creditors' attempt to serve Forever Green was once again insufficient because the Petitioning Creditors did not obtain a reissued summons and therefore failed to comply with Fed. R. Bankr. P. 7004(e) that requires service of summons and complaint within 14 days after the summons was issued.  Second, Forever Green argued that the Involuntary Petition should be dismissed because it was filed in

bad faith.

Subsequent to the filing of the Motion and apparently attempting to negate Forever Green's first-asserted ground for dismissal, the Petitioning Creditors filed a Praecipe to Re-Issue Summons.  Fed. R. Bankr. P. 7004(e) requires that "the summons and complaint be deposited in the mail within 14 days after the summons is issued."  Fed. R. Bankr. P. 7004(e).  The Petitioning Creditors then filed two certificates of service.  The first filed on November 7, 2012 [Docket No. 29] failed, once again, to comply with Fed. R. Civ. P. 4(h) because it did not identify the person upon whom the summons was served.  The second certificate of service filed with this Court on November 9, 2012 [Docket No. 30] (the "Second Certificate") indicates that the summons was served upon "Keith Day, Pres., Forever Green Athletic Fields, Inc."  However, the second certificate did not state at what address Keith Day was served.

In apparent recognition of the deficiency of the Second Certificate, the Petitioning Creditors filed on November 15, 2012, a third certificate of service [Docket No. 34] (the "Third Certificate").  In contrast to the Second Certificate, the Petitioning Creditors attached to the Third Certificate a return receipt that indicates that, on November 9, 2012, they served "Keith Day, President, Forever Green Athletic Fields, Inc., 124 South Maple Street, Suite 100, Ambler, Pennsylvania 19002."

On January 15, 2013 and February 11, 2013, this Court held evidentiary hearings on the Motion to Dismiss (the "Hearings").  Apparently, Forever Green was at that time satisfied that service was sufficient because Forever Green did not argue or otherwise reference the first ground for dismissal asserted by the Motion to Dismiss.[3]  Instead, this Court only heard evidence with regard to whether the

---

[3] After the filing of the Motion to Dismiss, the Petitioning Creditors filed on November 5, 2012, a Praecipe to Re-Issue Summons [Docket No. 26] (the "Praecipe").  While the service of the reissued summons appears to have quelled Forever Green's concerns regarding the sufficiency of service, this Court doubts whether the procedure followed by the Petitioning Creditors comports with applicable rules.  *See, e.g.,* Fed. R. Civ. P. 4(m) (requiring requires that service of summons and complaint occur within 120 days); *In re O'Quinn, III,* 359 B.R. 675, 678 (Bankr. E.D. Tenn. 2006) (assuming in passing that Rule 4(m) by virtue of Rule 1010(a)'s reference to Rule 7004(a) applies to service of involuntary petitions); *Blutrich,* 227 B.R. at 59 n.4 (noting without explanation that application of Rule 4(m) empowered court to dismiss involuntary petition not served within 120 days).  However, by appearing at the Hearings and failing to raise any issue regarding the Petitioning Creditors' failure to comply with Rule 4(m), Forever Green waived any further objection to the propriety of service.  *McCurdy v. American Board of Plastic Surgery,* 157 F.3d 191, 194-95 (3d Cir. 1998) (holding "that a defense that service of process was untimely under Rule 4(m) is subject to Rule 12's waiver provisions").

Involuntary Petition was filed in bad faith, Forever Green's second ground for dismissal. This Court

heard the testimony of Keith Day, Forever Green's sole officer and director ("Mr. Day"). The parties

called no other witnesses to testify.

At the close of the Hearings, this Court advised the parties that it was not prepared to rule on the

Motion to Dismiss. This Court took under advisement the issue of whether it should dismiss the

Involuntary Petition as being filed in bad faith because Mr. Dawson invoked this Court's jurisdiction for

an improper purpose. The parties then requested the opportunity to provide briefs addressing this issue.

This Court assented to their request and permitted the parties to submit simultaneous briefs. This Court is

in receipt of the parties' briefs.

## FACTUAL BACKGROUND

The parties do not contest whether the Petitioning Creditors are the holders of bona fide claims,

whether Forever Green is not paying its debts as they become due, or whether Forever Green has more

than twelve creditors. The only issue before this Court is whether this Court's jurisdiction was invoked in

bad faith for the purpose of interfering with Forever Green's litigation of its claims against Mr. Dawson

and the entities he owns. The record before this Court as summarized herein is largely limited to that

issue.

### The Putative Debtor

Forever Green is a corporation organized and existing under the laws of the Commonwealth of

Pennsylvania with its principal place of business of 124 South Maple Street, Suite 100, Ambler,

Pennsylvania 19002. Forever Green's sole officer and director is Mr. Day. Forever Green was formed

for the purpose of selling and installing artificial grass athletic fields. The parties dispute whether Forever

Green remains an operating business. While Mr. Day believes that certain opportunities present the

possibility that Forever Green may in the near future resume operations, the record contains scant

evidence that Forever Green is anything more than a shell entity in the process of winding down its

business affairs.

During the 2012 calendar year, Forever Green's operating account shows no activity and its

balance never exceeded $30. Despite Forever Green's lack of cash on hand, Mr. Day estimates that the value of Forever Green's current assets to exceed $6,000,000. Mr. Day states that these assets include accounts receivable, equipment, inventory and unliquidated claims. However, the bulk of this value is tied up in three claims Forever Green was litigating prior to the filing of the Involuntary Petition.[4]

As discussed more fully below, Forever Green has been engaged in litigation since 2005 against the ProGreen Parties. Mr. Day values Forever Green's claims against these parties to be worth at least $5,000,000. Transcript of January 15, 2013 Hearing ("Transcript January 15, 2013"), 51:8-16. Forever Green alleges that the Petitioning Creditors filed the Involuntary Petition for the purpose of interfering with its prosecution of these claims.

The next largest claim being litigated by Forever Green is a malpractice claim against Stephen Babcock (the "Babcock Claim"), its former attorney who represented Forever Green in litigation brought by the Dawsons.[5] The current status of Forever Green's litigation of the Babcock Claim has not been disclosed to this Court. However, Mr. Day acknowledged that prior to commencing its suit against Mr. Babcock, Forever Green received from Mr. Babcock a settlement offer of $100,000. Transcript January 15, 2013, 52:7-12.

Finally, Forever Green has a collection action pending in California where Forever Green is attempting to receive payment on a $50,000 receivable (the "Collection Action"). Transcript January 15, 2013, 51:6-7. If Forever Green has other outstanding receivables, those receivables were not identified during the proceedings before this Court.

Against these assets are some sizeable debts. All told, Mr. Day estimates Forever Green's total liabilities to be approximately $2,300,000. The Debtor's largest creditor is M&T Bank. The indebtedness to M&T Bank relates to a business line of credit evidenced by a Note executed by Forever Green in favor of Wilmington Trust of Pennsylvania in the amount of $950,000 (the "Line of Credit") and

---

[4] Mr. Dawson testified that he only knows of two assets held by Forever Green, $1,640 held by the VPW Firm and the Babcock Claim, as defined *infra*.

[5] This litigation is discussed below where it is defined as the Louisiana Litigation.

presently held by M&T Bank.  The Line of Credit is secured by a blanket lien on all of Forever Green's

assets inclusive of its interest in Forever Green's claims against the ProGreen Parties and the Babcock

Claim.  Transcript of February 11, 2013 Hearing ("Transcript February 11, 2013"), 35:19-23.  The

amount presently due pursuant to the Line of Credit is approximately $1,300,000.  Transcript January 15,

2013, 52:20-23.

　　　　While Forever Green has not been paying any of its debts, it is not the case that the Putative

Debtor's creditors were not being paid.  In addition to funding Forever Green's various litigation

expenses, Mr. Day has also seen to the payment of certain of Forever Green's debts.  While this Court

was not provided with independent evidence substantiating the payment of Forever Green's trade

payables, Mr. Day admits that he has been personally paying down some of Forever Green's trade

payables and outstanding taxes.  Transcript January 15, 2013, 55:14-16.  With regard to Forever Green's

outstanding taxes, Forever Green provided evidence that Mr. Day has caused the release of eight state and

federal tax liens.  While some of Forever Green's creditors are being paid, such payments are being made

by Mr. Day from his personal funds.  Similarly, Mr. Day is also funding Forever Green's bankruptcy

litigation as well as Forever Green's other pending litigation.  To the extent Forever Green has any

continuing purpose, its purpose now appears to be limited to pursuing the litigation of claims against

various parties who are alleged to have contributed to its present financial difficulties.

**The Petitioning Creditors**

　　　　The Petitioning Creditors are comprised of three creditors: Charles C. Dawson, Kelli Dawson and

Cohen Seglias.  Each of the Petitioning Creditors holds a judgment against Forever Green.  Cohen Seglias

claims it is owed $206,126.00 pursuant to a judgment entered by the Court of Common Pleas of

Philadelphia County.  No additional information has been provided with regard to the nature of the Cohen

Seglias claim.  Mr. Dawson claims he, along with his wife,[6] is owed $306,006.24 representing amounts

due pursuant to a consent judgment dated April 5, 2011 (the "Consent Judgment") entered by the 19th

---

[6] Mrs. Dawson claims that she is owed $32,957.03 pursuant to the Consent Judgment.

Judicial District Court, Parish of East Baton Rouge, Louisiana in the case captioned *Charles C. Dawson and Kelli L. Dawson v. Forever Green Athletic Fields, Inc., David Ripka and Keith Day*, Civil No. 547, 844, Sec. 26 (the "Louisiana Litigation").

In late 2006, Mr. Dawson became a member of ProGreen when he acquired a 32% ownership interest in ProGreen. At that time, ProGreen had two other members: Raymond Fritz who held a 32% ownership interest and Daniel A. DaLuise who held a 36% ownership interest. Exh. PD-17 Deposition of Charles C. Dawson dated January 5, 2012 ("Dawson Deposition"). On May 18, 2010, Mr. DaLuise's ownership interest was transferred to Mr. Fritz and Mr. Dawson in equal shares. Thereafter, each held a 50% ownership interest. This arrangement continues to the present. This Court has not been provided sufficient information to understand Mr. Dawson's exact relation to the genesis of Forever Green's claims against the ProGreen Parties. However, it is clear that Mr. Dawson, as an owner of one of the entities sued by Forever Green, has fairly sizeable financial interest in the outcome of these claims.

**The Pending Litigation**

The pending litigation may be traced back to June 9, 2005, when Forever Green initiated a lawsuit in the Bucks County Court of Common Pleas (the "Bucks County Action")[7] against the following parties: the ProGreen Parties, Michael Lasiter, and Lasiter Construction, Inc.[8] In the Bucks County Action, Forever Green sought damages in excess of $5,000,000 relating to the alleged diversion of corporate assets from Forever Green. Mr. Dawson is alleged to have played a central role in the purported scheme and used his position as a sales representative of Forever Green to divert corporate assets from Forever Green to ProGreen. The Bucks County Action was later removed to the United States District Court for the Eastern District of Pennsylvania (the "District Court Action").[9]

---

[7] The Buck County Action is captioned *Forever Green Athletic Fields, Inc. v. ProGreen Surfaces, Inc., et al.*, Civil No. 05-3092-30-1.

[8] On August 3, 2005, Forever Green voluntarily dismissed its claims against Michael Lasiter and Lasiter Construction, Inc.

[9] The District Court Action is captioned *Forever Green Athletic Fields, Inc. v. ProGreen Surfaces, Inc., et al.*, Civil No. 05-3519.

While the District Court Action was pending, the Dawsons initiated the Louisiana Action. That action was originally filed on May 3, 2005, and on August 26, 2005, was dismissed by the plaintiffs without prejudice. The Dawsons reinitiated the Louisiana Action by filing a second complaint on September 27, 2006. In the Louisiana Action, the Dawsons sought payment of unpaid commissions allegedly owed by Forever Green to Mr. Dawson and unpaid wages allegedly owed by Forever Green to Mrs. Dawson.

Although Forever Green and the other defendants, Mr. Day and David B. Ripka ("Mr. Ripka"), to the Louisiana Action contested the legitimacy of the claims asserted by the Dawsons, it appears that the defendants ultimately determined that it was not worth the expense of litigating the claims. As a result, the parties to the Louisiana Action agreed to the entry of a Consent Judgment dated March 2, 2011, wherein a judgment was entered against Forever Green in the amount of $306,006.24 (the "Consent Judgment"). On March 4, 2011, a hearing was held in the Louisiana Action whereby the Court heard testimony from the parties regarding the merits of the Consent Judgment. At this hearing, Mr. Day stated that Forever Green had at the end of 2010 suspended operations and was in the process of winding down. With regard to his personal financial circumstances, Mr. Day estimated that he had a personal net worth of ($300,000). Later, pursuant to an Order dated June 30, 2011, the other defendants were adjudged to be not liable on the Dawsons' claims based upon the court's determination that the Dawsons' claims were barred by the applicable statute of limitations.

By the time of the entry of the Consent Judgment, the District Court Action had been suspended in favor of a private arbitration proceeding. On April 1, 2008, the parties to the District Court Action executed a Binding Arbitration Agreement (the "Arbitration Agreement") wherein the parties agreed to resolve all claims, other than those that were then pending in the Louisiana Action, through binding arbitration as governed by the Federal Arbitration Act. Pursuant to the Arbitration Agreement, Forever Green, Mr. Day, and Mr. Ripka agreed to arbitrate their claims against ProGreen Parties. Pursuant to the terms of the Arbitration Agreement, the parties agreed to appoint Howard D. Venzie, Jr. (the "Arbitrator") of the law firm Venzie, Phillips & Warshawer, P.C. (the "VPW Firm"). The Arbitration Agreement also

provided:

> Cooperation.  The parties hereto agree to cooperate and assist in the implementation of
> this Agreement, and hereby agree to execute any and all documents necessary to
> effectuate their Agreement hereunder.

Arbitration Agreement, ¶ 16, Exh. PD-4.

Shortly after the entry of the Consent Judgment, the ProGreen Parties submitted to the Arbitrator a Motion to Terminate dated March 30, 2011 (the "Motion to Terminate").  Exh. PD-8, Motion to Terminate.  In the Motion to Terminate, the ProGreen Parties asserted the arbitration should be terminated because their opponents- inclusive of Forever Green, Mr. Day, and Mr. Ripka - lacked the ability to pay the Arbitrator's fees.  In addition to questioning the ability of their opponents to finance their participation in the arbitration, the ProGreen Parties also alleged that the Dawsons had obtained the Consent Judgment and would be shortly transferring it to Pennsylvania to execute upon approximately $1,640 held by the VPW Firm as an advance deposit for the future payment of Forever Green's share of the Arbitrator's fees (the "Advance Deposit").  As stated by Mr. Dawson, he authorized the filing of the Motion to Terminate because, in his words, "I don't believe [the arbitration] has any merit and I'm sick of paying attorneys." Exh. PD-17, Dawson Deposition, 186:10-24.

The Motion to Terminate provides an excellent summary of Forever Green's financial condition as of the time the Dawsons executed the Consent Judgment.  In the Motion to Terminate, the ProGreen Parties stated: "it has become clear that [Forever Green] is insolvent…" and "has terminated all of its employees and is no longer generating sufficient revenue to meet its expenses as they come due."  Exh. PD-8, Motion to Terminate, ¶¶2&31.  The ProGreen Parties further stated their belief that as of April 7, 2010, Forever Green had total debts of $2,966,891.  Exh. PD-8, Motion to Terminate, ¶50.  Forever Green's primary indebtedness consisted of the Line of Credit.[10]  The ProGreen Parties asserted that as of February 23, 2011, the Line of Credit had a balance of approximately $1,350,000.  The ProGreen Parties

---

[10] In connection with the execution of the Line of Credit, Mr. Day, along with Mr. Ripka, Mr. Fritz and their respective spouses, executed a guaranty in favor of Wilmington Trust.

identified nine tax liens in the total amount of $498,292[11] that had been filed against Forever Green.  The

ProGreen Parties also identified three judgments against Forever Green, inclusive of the Consent

Judgment, in the total amount of $544,503.[12]  Whether or not the figures cited by the Motion to Terminate

were correct, it is clear that they depict dire financial circumstances.

On April 26, 2011, the Dawsons caused the transfer of the Consent Judgment to Philadelphia and

Montgomery Counties.  As stated by Mr. Dawson, he caused the transfer of the Consent Judgment:

> [T]o use that judgment to levy any monies I can find anywhere, whether it be the
> arbitrator or anyone else.  So, yeah, if we can get the lien paid, that's my number one
> objective.  If I can get it paid, I'm very happy.

Exh. PD-17, Dawson Deposition, 187:15-188:1.

On April 27, 2011, and in response to the Motion to Terminate, the Arbitrator advised the parties

that he would suspend the arbitration.  The Arbitrator recognized that the Dawsons' intent to garnish the

Advance Deposit made him adverse to the ProGreen Parties that in turn prevented him from continuing as

the Arbitrator.  On April 28, 2011 and knowing that their action would cause the suspension of the

arbitration, the Dawsons obtained a writ of execution that they executed against the Arbitrator and the

VPW Firm on May 5, 2011.

In response to the suspension of the arbitration, Forever Green, Mr. Day, and Mr. Ripka filed a

complaint in the Court of Common Pleas of Philadelphia County seeking a declaratory judgment and

other relief in an action captioned *Forever Green Athletic Fields, Inc., Keith Day, et al. v. Charles C.*

*Dawson and Kelli L. Dawson, et al.*, Case No. 110602246 (the "Philadelphia Action").  While the

---

[11] These tax liens included the following: (1) a tax lien in the amount of $84,108.67 filed by the Internal Revenue Service on October 1, 2008; (2) a tax lien in the amount of $62,181.73 filed by the Internal Revenue Service on November 20, 2008; (3) a tax lien in the amount of $9,909.41 filed by the Pennsylvania Department of Revenue on February 26, 2009; (4) a tax lien in the amount of $45,414.84 filed by the Internal Revenue Service on March 3, 2009; (5) a tax lien in the amount of $5,337.29 filed by the Pennsylvania Department of Labor on April 3, 2009; (6) a tax lien in the amount of $15,635.98 filed by the Pennsylvania Department of Revenue on May 20, 2010; (7) a tax lien in the amount of $4,855.61 filed by the Pennsylvania Department of Labor on June 29, 2010; (8) a tax lien in the amount of $269,517.66 filed by the Internal Revenue Service on July 19, 2010; and (9) a tax lien in the amount of $1,330.89 filed by the Internal Revenue Service on September 3, 2010.

[12] In addition to the Consent Judgment, the Motion to Terminate identified two other judgments against Forever Green: (1) a judgment dated March 18, 2010, in the amount of $38,370.79 held by Asphalt Fabric and Engineering Inc.; and (2) a judgment dated December 29, 2010, in the amount of $206,126.00 held by Cohen Seglias.

Philadelphia Action remained pending, counsel for the Dawsons initiated settlement discussions with Forever Green. Although the parties allege that the discussion began immediately after the Dawsons executed upon the Advanced Deposit held by the Arbitrator, the only evidence of the substance of these discussions submitted to this Court is a letter dated November 4, 2011, from Lee Herrington the Dawsons' Louisiana counsel, to Christopher Alexander, Sr., Forever Green's prior counsel. Despite executing upon the Advance Deposit, the Dawsons have taken no steps to obtain possession of the $1,640 held by the VPW Firm. Exh. PD-17, Dawson Deposition, 220:11-220:22.

In this letter, Mr. Herrington, counsel for the Dawsons, offered the Dawsons' cooperation with Forever Green in its prosecution of the Babcock Claim in exchange for the termination of the arbitration proceedings. Mr. Dawson claims to have information in his possession that, if disclosed to Forever Green, would be of "great assistance" to Forever Green in its prosecution of the Babcock Claim. Exh. PD-17, Dawson Deposition, 224:8-17. However, the letter states Mr. Dawson's unwillingness to share this information unless the Consent Judgment was first paid. In addition, the letter contained a separate offer whereby the Dawsons would release Forever Green from the Consent Judgment if Forever Green could secure a release from M&T Bank of the personal guaranty of the Line of Credit executed by Mr. Fritz and his spouse. The letter concludes by noting that the Dawsons are prepared to use their Consent Judgment to execute upon the Babcock Claim but will refrain from doing so as a signal of their "good faith.[13] For whatever reason, the parties did not reach a settlement along the lines proposed by this letter and the Philadelphia Action proceeded. As explained by Mr. Dawson, his purpose in authorizing his attorney to send this letter was to effect a global settlement whereby he would release Forever Green from his personal claims in exchange for Forever Green abandoning its claims against the Dawsons and the ProGreen Parties. Exh. PD-17, Dawson Deposition, 204:24-2-5:21; 241:7-11.

On March 6, 2012, the court in the Philadelphia Action issued a scheduling order to allow the consideration of whether the court could issue a final order disposing of Count I of the Second Amended

---

[13] Apparently, the Dawsons have subsequently used their Consent Judgment to seize the Babcock Claim.

Complaint dated November 20, 2011.  Generally speaking, Count I sought a declaration from the court

that the payments made to the Arbitrator, inclusive of the Advance Deposit, and held by the VPW Firm

were immune from garnishment and free of all claims of the Dawsons.  This order required (1) the parties

to the Philadelphia Action file on or before March 30, 2012, a joint stipulation of facts; (2) the plaintiffs

to the Philadelphia Action file on or before April 18, 2012, a memorandum of law in support of their

request for declaratory relief; and (3) the defendants to the Philadelphia Action file on or before May 3,

2012, a memorandum of law in opposition to the plaintiffs' request for declaratory relief.

On March 30, 2012, the parties did file their joint statement of facts.  Exh. C-11, Joint Stipulation

of Facts.  On April 18, 2012, the plaintiffs in the Philadelphia Action did file their memorandum of law in

support of their request for declaratory relief.  However, the ProGreen Parties never filed their

memorandum.  Instead, on April 20, 2012, the Petitioning Creditors filed the Involuntary Petition against

Forever Green and simultaneously filed a suggestion of bankruptcy in the Philadelphia Action.  Upon

receipt of the suggestion of bankruptcy, the court in the Philadelphia Action placed the action in deferred

status.  After the Forever Green Parties contested the placement of the Philadelphia Action in deferred

status, the ProGreen Parties filed in the Philadelphia Action on May 14, 2012, a notice of removal

removing the case to this Court.  Since its removal, there has been no action in the Philadelphia Action.

## DISCUSSION

The sole issue before this Court is whether Mr. Dawson acted in bad faith when he joined with

the other Petitioning Creditors to file the Involuntary Petition against Forever Green.  The Petitioning

Creditors argue that Mr. Dawson's status as a judgment creditor inoculates him from any imputation of

bad faith.  Problematically, this argument conflates two issues.  The fact that Mr. Dawson is a judgment

creditor establishes that he is a bona fide creditor for purposes of the §303(b)(1) inquiry.  However, the

fact that Mr. Dawson is a judgment creditor does not establish that he invoked this Court's jurisdiction for

a proper bankruptcy purpose.  As discussed below, the bad faith inquiry is a separate and independent

from the inquiry as to a creditor's bona fides.  *Shinko v. Miele*, 29 Fed. Appx. 890, 890-91 (3d Cir. 2002)

(recognizing that a creditor's bad faith is an independent ground for dismissal of an involuntary petition);

*In re Bock Transp., Inc.*, 327 B.R. 378, 381 (8th Cir. BAP 2005) (same).  Contrary to the position of the

Petitioning Creditors, bad faith may be imputed to a bona fide creditor when that creditor has filed an

involuntary petition for a non-bankruptcy purpose.

      The Bankruptcy Code contains no express requirement that an involuntary petition be filed in

good faith nor does it define what constitutes a bad faith purpose for filing of an involuntary petition.

While the Code may provide for specific sanctions for specific instances of bad faith,[14] bad faith on the

part of any petitioner will generally disqualify a petitioner from invoking the jurisdiction of this Court.

Looking at the big picture, this Court understands the bad faith inquiry as relating to its jurisdiction.

Being a court of equity, this Court's jurisdiction may not be invoked in bad faith.  *NMSBPCSLDHB v.*

*Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 127 (3d Cir.

2004) (stating that the provisions of the Bankruptcy Code are to be invoked only after a case has been

filed with a legitimate bankruptcy purpose); *In re African Union First Colored Methodist Protestant*

*Church*, 184 B.R. 207, 222 (Bankr. D. Del. 1993) ("A bankruptcy court as a court of equity has the

inherent power to dismiss a case when its jurisdiction has been improperly invoked.").

      To invoke this Court's jurisdiction, a petitioner must possess a valid bankruptcy purpose.  *In re*

*Integrated Telecom Express, Inc.*, 384 F.3d at 119-20.  In the context of Chapter 7 proceedings, that

purpose must be to marshal a debtor's assets in order to achieve a greater pro rata distribution among a

debtor's various unsecured creditors than what would be otherwise available outside of bankruptcy.  *Id.* at

120 n.4 (differentiating what constitutes a valid bankruptcy purposes in the context of a reorganization

versus a liquidation); *African Union First Colored Methodist*, 184 B.R. at 218.  A petitioner must have

some plausible reason to believe that the bankruptcy system is necessary to maximize the recovery of a

debtor's creditors.  As stated by the Third Circuit, in *Integrated Telecom*,

      To be filed in good faith, a petition must do more than merely invoke some distributional
      mechanism in the Bankruptcy Code.  It must seek to create or preserve some value that

---

[14] Section 303(i) does provide that a putative debtor may be entitled to attorneys' fees and costs if a court dismisses
an involuntary petition and finds that the petitioning creditors filed the petition in bad faith.  11 U.S.C. §303(i).

would otherwise be lost-not merely distributed to a different stakeholder-outside of bankruptcy.

*Integrated Telecom Express, Inc.*, 384 F.3d at 129.

A further distinction must be made between voluntary and involuntary proceedings. In the context of voluntary Chapter 7 petitions, the purpose is to prevent the collection efforts of certain creditors from gaining an advantage over less diligent creditors. Whereas, involuntary Chapter 7 petitions serve to prevent a debtor from choosing to pay certain creditors over other similarly situated creditors. *In re Silverman*, 230 B.R. 46, 53 (Bankr. D.N.J. 1998) (recognizing that an involuntary petition should be filed "to protect one's interest relative to other creditors or to prevent dissipation of assets").

The task of determining whether a petitioner has acted in bad faith is not simple. This Court would be naïve to assume that a petitioner will freely admit that it lacks a valid bankruptcy purpose. Accordingly, bankruptcy courts refer to a variety of tests to determine an involuntary petitioner's true intent. Courts of other jurisdictions, led by decisions issued by the Second and Eleventh Circuits, employ a series of tests to determine whether an involuntary petition was filed in bad faith. *Lubow Machine Co. v. Bayshore Wire Products Corp. (In re Bayshore Wire Products Corp.)*, 209 F.3d 100 (2d Cir. 2000); *General Trading Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485 (11th Cir. 1997). These courts apply four separate inquiries to determine whether an involuntary petition was filed in bad faith: the improper use inquiry, the improper purpose inquiry, the reasonable person inquiry, and the Rule 9011 inquiry. *In re Bayshore Wire Products Corp.*, 209 F.3d at 105-6. Courts do not hew to one of these tests. Rather, courts apply these tests concurrently as a part of their analysis of whether a petitioning creditor acted in bad faith. *Id.* (acknowledging "no need to choose among the various tests for bad faith in disposing of this case"); *General Trading Inc.*, 119 F.3d at 1502 (finding good faith evidenced under each test); *Duran v. Antonini (In re Antonini)*, Adv. No. 10-03792, 2012 WL 112978, at *8 (Bankr. S.D. Fla. Jan. 12, 2012) (stating that bad faith may be evidenced by "any one of the tests"); *In re Hentges*, 351 B.R. 758 (Bankr. N.D. Okla. 2006) (holding that petitioning creditors did not act in bad faith under any of

tests); *In re Better Care, Ltd.*, 97 B.R. 405, 409 (Bankr. N.D. Ill. 1989) ("if it smells like bad faith, it's got to be bad faith.").

The Third Circuit has not squarely addressed the issue of the appropriate test for a bad faith in an involuntary filing.  However, the Third Circuit has held that in the context of voluntary petitions, a bankruptcy court should infer the purposes of a petitioner from the totality of the circumstances.  *In re Myers*, 491 F.3d 120, 125 (3d Cir. 2007) (stating that a bankruptcy court must look to the totality of the circumstances to determine whether a petition was filed in bad faith); *In re Skyworks Ventures, Inc.*, 431 B.R. 573 (Bankr. D.N.J. 2010) (evaluating the totality of the circumstances to determine involuntary petition was filed to forced putative debtor to accept settlement); *In re Spade*, 258 B.R. 221, 232 (Bankr. D. Colo. 2001) (evaluating events leading up to filing of involuntary petition to assess the motives of the petitioning creditors).  Third Circuit precedent suggests that the same standard should be applied in the context of involuntary petitions.  *Miele*, 29 Fed. Appx. at 981 (citing cases addressing bad faith in the context of voluntary petitions to establish for purpose of defining bad faith in the context of involuntary petitions).

Accordingly, this Court will look to the totality of the circumstances to determine whether the preponderance of the evidence indicates that Mr. Dawson acted in bad faith.  *Myers*, 491 F.3d at 125 (upholding dismissal of chapter 13 petition determined to be filed in bad faith); *Integrated Telecom Express, Inc.*, 384 F.3d at 127 (holding that chapter 11 petition was not filed in good faith and should have been dismissed on that basis); *In re SGL Carbon Corp.*, 200 F.3d 154, 165 (3d Cir. 1999) (holding that chapter 11 petition was not filed in good faith); *In re Lilley*, 91 F.3d 491, 496 (3d Cir. 1996) (holding that bad faith in filing is sufficient cause for dismissal of Chapter 13 petition).  This approach requires an examination of all relevant factors, and as a result, adopt an approach that includes the considerations raised by the various tests of bad faith adopted in courts outside of the Third Circuit.

In evaluating the totality of the circumstances, this Court is charged with determining whether the provisions of the Bankruptcy Code were invoked for a legitimate bankruptcy purpose.  *Integrated Telecom Express, Inc.*, 384 F.3d at 108.  The Petitioning Creditors enjoy a presumption that they acted in

good faith that the Debtor must rebut by showing, by a preponderance of the evidence, that bad faith

exists. *In re Bayshore Wire Products Corp.*, 209 F.3d 100; *Di Loretto v. Costigan*, 600 F.Supp.2d 671,

690 (E.D. Pa. 2009); *In re Petralex Stainless, Ltd.*, 78 B.R. 738, 743 (Bankr. E.D. Pa. 1987).

      As evidence of Mr. Dawson's bad faith, the Debtor alleges that Mr. Dawson effectuated the filing

of the involuntary petition for two improper purposes: (1) to frustrate the Debtor's efforts to litigate its

claims against the ProGreen Parties; and (2) to force Mr. Day to pay on behalf of the Debtor the amounts

due to the Dawsons pursuant to the Consent Judgment.  Both, if supported by the record, would be

sufficient to impute bad faith to Mr. Dawson.  The Third Circuit has defined as a matter of principle that

the filing for bankruptcy relief for the purpose of exerting pressure on an opponent in pending litigation is

evidence of bad faith. *SGL Carbon Corp.*, 200 F.3d at 163-65 (recognizing that filing for bankruptcy

relief solely for the purpose of gaining tactical advantage in pending actions is evidence that a petition

lacks good faith); *In re Earl Sims, Jr.*, 994 F.2d 210, 217 (5th Cir. 1993) (recognizing that the rules

limiting who may institute an involuntary petition were intended to avoid the possibility that the threat of

an involuntary petition may be used "to compel the debtor to make preferential payments to one or more

litigious creditors"); *In re Tobacco Road Associates, LP*, Civ. No. 06-2637, 2007 WL 966507, at *6 (E.D.

Pa. Mar. 30, 2007) (recognizing that disputes as to the enforcement of debts are best resolved in courts of

general jurisdiction); *Skyworks Ventures, Inc.*, 431 B.R. at 579 (finding that filing of involuntary petition

was part of scheme to force the settlement of a claim against a petitioning creditor); *In re Tichy Elec. Co.

Inc.*, 332 B.R. 364, 374 (Bankr. N.D. Iowa 2005) ("Bad faith has been found to exist when a creditor's

actions amount to an improper use of the Bankruptcy Code as a substitute for customary collection

procedures."); *In re WSB-RSK Venture*, 296 B.R. 509, 513-14 (Bankr. C.D. Cal. 2003) (finding

involuntary petition was filed as a litigation tactic and as result dismissing the involuntary petition as

being filed in bad faith).

      When a petitioner invokes this Court's jurisdiction in order to gain a tactical advantage in

pending litigation, this Court may infer that the petitioner lacks a valid bankruptcy purpose. *Integrated

Telecom Express, Inc.*, 384 F.3d at 119-20; *SGL Carbon Corp.*, 200 F.3d at 165.  The same is true in

involuntary proceedings.  Courts have found that the filing of an involuntary petition as part of a creditor's effort to forestall pending litigation with the putative debtor to be evidence of that creditor's bad faith.  *WSB-RSK Venture*, 296 B.R. at 513-14  (finding involuntary petition was filed as a litigation tactic and as result dismissing the involuntary petition as being filed in bad faith); *In re Silverman*, 230 B.R. at 52 (finding that filing of involuntary petition within weeks of state court action constituted evidence of "egregious bad faith").

Evidence indicates that the filing of the Involuntary Petition was part of Mr. Dawson's larger strategy to exert pressure on Forever Green and Mr. Day to accede to Mr. Dawson's demands.  Mr. Dawson's prepetition conduct indicates that his litigation strategy was to use any means necessary to force the payment of the Consent Judgment and the abandonment of Forever Green's claims against the ProGreen Parties.  At the time the Dawsons obtained the Consent Judgment, they had knowledge that Forever Green was essentially judgment proof.  Less than a month after obtaining the Consent Judgment, Mr. Dawson caused the filing of the Motion to Terminate.  Not only does the Motion to Terminate set forth in detail Forever Green's dire financial situation, it contains the first indication that Mr. Dawson's purpose in obtaining the Consent Judgment was not to execute upon Forever Green's assets but to interfere with Forever Green's ability to prosecute its claims against the ProGreen Parties.

Mr. Dawson admits that he transferred the Consent Judgment and used it to execute upon the Advanced Deposit knowing that his actions would cause the suspension of the arbitration of Forever Green's claims against the ProGreen Parties.  He admits that he undertook this action with the intent of forcing the Debtor or Mr. Day to pay the Consent Judgment.  By causing the suspension of the arbitration and refusing to allow it to proceed unless he was paid on the Consent Judgment, he put his personal interests ahead of Forever Green's other creditors.  Mr. Dawson prevented Forever Green from collecting its largest asset and divested Forever Green of its only means of paying its other, higher-priority claims. His actions were not in accordance with the spirit of collective creditor action that must color the purposes of petitioning creditors.  If anything, Mr. Dawson's zealous pursuit of his claim is exactly the type of conduct that Chapter 7 proceedings are designed to prevent.  *U.S. on Behalf of I.R.S. v. Norton*,

717 F.2d 767, 770-71 (3d Cir. 1983) (discussing how bankruptcy is designed to effect an orderly

liquidation among creditors that may be otherwise undermined by the legal efforts of diligent creditors).

As admitted by Mr. Dawson, the filing of the Involuntary Petition was one of the many means he

chose to pursue to force the payment of his claims and the abandonment of Forever Green's claims

against the ProGreen Parties.  Exh. PD-18, Deposition of Charles C. Dawson dated January 2, 3013

("Dawson Deposition II") 10:5-19 (listing the filing of the Involuntary Petition as one of the actions

recommended to him to force the payment of the Consent Judgment).  While Mr. Dawson is entitled to

use any legal means to collect any monies owed to him, the filing of an involuntary petition is not

necessarily among those means. *Skyworks Ventures,* 431 B.R. at 579 (finding that filing of involuntary

petition was part of scheme to force the settlement of a claim against a petitioning creditor); *Tichy Elec.*,

332 B.R. at 374 ("Bad faith has been found to exist when a creditor's actions amount to an improper use

of the Bankruptcy Code as a substitute for customary collection procedures."); *In re John Richards Home*

*Bldg. Co., LLC*, 291 B.R. 727, 735 (Bankr. E.D Mich. 2003) (finding that petitioning creditor acted in bad

faith because he filed petition to force a settlement) *aff'd* 439 F.3d 248 (6th Cir. 2006); *In re Cannon*

*Express Corp.*, 280 B.R. 450, 455-56 (Bankr. W.D. Ark. 2002) (finding that petitioning creditor's

statement that he filed "to get my money" without regard to other creditors' priorities was evidence of bad

faith); *Silverman*, 230 B.R. at 53 (finding that petitioning creditor's improper purpose was evidenced by

"his statement that he was advised that he would gain a strategic advantage by filing an involuntary

petition").  Based upon Mr. Dawson's prepetition course of conduct, this Court finds that Forever Green

has presented sufficient evidence to establish that the Involuntary Petition was used by Mr. Dawson as a

litigation tactic to further his personal financial interests thereby rebutting the presumption that Mr.

Dawson acted in good faith.

This conclusion is buttressed by the timing of the filing of the Involuntary Petition and the lack of

diligence exhibited by the Petitioning Creditors in effecting service of the Involuntary Petition.  The

Involuntary Petition was filed a week before the ProGreen Parties were to file in the Philadelphia Action

their memorandum in opposition to declaratory relief.  *See, e.g., Silverman*, 230 B.R. at 52 (finding that

filing of involuntary petition within weeks of state court action constituted evidence of "egregious bad faith"). In addition and after invoking this Court's jurisdiction, the Petitioning Creditors were less than diligent in their prosecution of this proceeding. *In re Express Car & Truck Rental, Inc*., 440 B.R. 422 (Bankr. E.D. Pa. 2010) (recognizing that the filing of an involuntary petition should be "the product of due diligence and sober decision making"). While the Petitioning Creditors had no difficulty serving the court in the Philadelphia Action with a suggestion of bankruptcy and notice of removal, the same is not true of their efforts to effect service of the Involuntary Petition upon Forever Green.

While this Court finds that ample evidence exists in the record to infer an improper purpose motivated the filing of the Involuntary Petition, the same is not true with regard to evidence that the Petitioning Creditors were motivated by a proper purpose. Admittedly, the lack of evidence on this issue may be the result of the failure of the Petitioning Creditors to understand the bad faith issue. The Petitioning Creditors did little more than argue that their status as judgment creditors precludes a determination of bad faith. As this Court has noted, this argument improperly conflates the bona fide creditor inquiry with the bad faith inquiry. The fact that a creditor may hold a bona fide claim does not preclude that creditor from acting in bad faith. *See, e.g., In re Nordbrock*, 772 F.2d 397, 400 (8th Cir. 1985) (recognizing that a creditor may not use the bankruptcy system if it can go to state court to collect a debt). A creditor who holds a bona fide claim must still have a reason to believe that the collective interests of a debtor's creditors would benefit from the invocation of bankruptcy relief.

In their Response[15] and at the Hearings, the Petitioning Creditors did not allege that Forever Green was preferring certain creditors over others. Rather, the only evidence regarding the payment of Forever Green's creditors shows that Mr. Day is using his *personal* assets to pay Forever Green's creditors who happen to also be Mr. Day's creditors. The Petitioning Creditors have presented no theory or reason why this Court could find that Mr. Day's personal assets should be considered part of Forever Green's estate.

---

[15] The Petitioning Creditors filed a Memorandum of Law in Opposition to Debtor's Motion to Dismiss Order for Relief dated November 9, 2012 [Docket No. 33] (the "Response").

The Petitioning Creditors do state they were motivated to file the Involuntary Petition to prevent the dissipation of Forever Green's assets which, if supported by the evidence, would be sufficient to justify their action.  Where evidence shows that the petitioning creditors had reason to suspect a putative debtor was preferring certain creditors over others or that the putative debtor was allowing the dissipation of assets thereby justifying the replacement of a putative debtor's management, courts have found that petitioning creditors were justified in filing an involuntary petition.  *In re Manhattan Industries, Inc.*, 224 B.R. 195, 201 (Bankr. M.D. Fla. 1997).  However, the Petitioning Creditors only cite Forever Green's prosecution of its claims against the ProGreen Parties as evidence of Forever Green's dissipation of assets.  Response, p. 2 (characterizing Forever Green's litigation of its claims against the ProGreen Parties as "a course of continuous litigious behavior to the detriment of its creditors.").  Problematically, as previously discussed, Forever Green is not even funding this litigation.  Mr. Day is using his personal assets to fund this litigation and the Petitioning Creditors have presented no explanation why Mr. Day's personal assets should be considered property of Forever Green's estate or otherwise reachable by Forever Green's creditors.  Even if Forever Green was funding the litigation, this Court has difficulty crediting the notion that the pursuit of Forever Green's only asset that may yield a meaningful recovery to its creditors can be characterized as a dissipation of estate assets.  To the contrary, the very act of prosecuting this claim would be instrumental to the marshaling of assets integral to any bankruptcy administration.

The only evidence before this Court shows that Forever Green has no assets other than what it may recover from the pending litigation against the ProGreen Parties, its prosecution of the Babcock Claim and the Collection Action.  Lacking any assets that may be liquidated, this Court cannot conceive of any outcome wherein forcing Forever Green to remain in bankruptcy would maximize the distribution of Forever Green's assets to its creditors or otherwise preventing their dissipation.  *See, e.g., In re Murpenter LLC*, Civ. No. 12-5060, 2012 WL 6645538, *3 (E.D. Pa. Dec. 21, 2012) (noting that no asset proceedings are not supported by the policies justifying Chapter 7 liquidation proceedings); *In re Systems Communications, Inc.*, 234 B.R. 145 (Bankr. M.D. Fla. 1999) (finding bad faith based on improper use

where lack of assets would have made administration of chapter 7 bankruptcy impossible).  Assuming a

Chapter 7 trustee decides Forever Green's claims are worth pursuing, the involvement of a Chapter 7

trustee will only add a layer of expense to the litigation of these claims and necessarily *reduce* the

potential funds available to pay Forever Green's creditors.[16]  Even assuming this Court could not refer to

Mr. Dawson's course of conduct that led to his decision to file the Involuntary Petition, the absence of

assets that may be liquidated precludes this Court from identifying a valid bankruptcy purpose for the

filing of the Involuntary Petition.

Without being able to divine any legitimate bankruptcy purpose for the filing of the Involuntary

Petition, this Court must conclude that the preponderance of the evidence indicates that Mr. Dawson filed

the Involuntary Petition in furtherance of an improper bankruptcy purpose.  *In re K.P. Enterprise*, 135

B.R. 174, 179 (Bankr. D. Me. 1992) ("when the petitioning creditor uses involuntary bankruptcy

proceedings in an attempt to obtain a disproportionate advantage for himself, rather than to protect against

other creditors obtaining a disproportionate advantage, particular when the petitioner could have

advanced its own interest in a different forum.").  Forever Green has alleged that the Involuntary Petition

was filed as a litigation tactic and has presented sufficient evidence to lend credence to its accusation.

Whereas, Mr. Dawson and the other Petitioning Creditors have failed to come forward with any evidence

suggesting that the administration of Forever Green's estate by this Court will yield some meaningful

benefit to Forever Green's creditors.

## SUMMARY

For the reasons discussed above, Forever Green's Motion to Dismiss is granted.  From this

Court's review of the evidentiary record, this Court finds no basis to infer that the filing of the

Involuntary Petition was motivated by a proper purpose.  To the contrary, this Court finds that the filing

---

[16] If a trustee was appointed and then determined that Forever Green's claims against the ProGreen Parties were not worth pursuing, Forever Green's claims would likely be extinguished thereby relieving Mr. Dawson of any liability to Forever Green.  *See, e.g., U.S. Dismantlement Corp., Inc. v. Brown Assoc., Inc.*, Civ. No. 97-1309, 2000 WL 433971, *4 (E.D. Pa. Apr. 13 2000) (holding that a corporate debtor may not pursue prepetition claims after its chapter 7 bankruptcy proceedings are closed).

of the Involuntary Petition is the litigation latest tactic employed by Mr. Dawson to frustrate Forever

Green's attempts to litigate its claims against him and the entities he owns.  As Mr. Dawson has amply

demonstrated, he does not lack alternative forums to pursue his claims.  A further hearing to consider

Forever Green's request for attorney's fees pursuant to 11 U.S.C. §303(i) will be held.

An Order consistent with this Memorandum will be entered.

Dated:  November 1, 2013

_____
MAGDELINE D. COLEMAN
UNITED STATES BANKRUPTCY JUDGE